**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**EDWARD P. HART,**

    **Plaintiff,**

                                                **Civil Action 2:14-cv-527**
    **v.**                                           **Judge Gregory L. Frost**
                                                **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**REPORT AND RECOMMENDATION**

    Plaintiff, Edward P. Hart, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Social Security Disability Insurance Benefits and Supplemental Security Income.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 14), Plaintiff's Reply (ECF No. 15), and the administrative record (ECF No. 8).  The Undersigned concludes that the ALJ failed to properly consider whether Plaintiff met the listing requirements for his epilepsy/seizure disorder. Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's decision and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.**

    Plaintiff filed his applications for benefits in January 2011, alleging that he has been

disabled since March 2003 due to a tumor in his left arm, epilepsy and seizures, depression, hepatitis C, arthritis, and a bullet wound in his right arm. (R. at 197-205, 205-11, 243.) Plaintiff's applications for benefits were denied initially and upon reconsideration.

Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Sandra R. DiMaggio Wallis (the "ALJ") held a hearing on December 11, 2012, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 37–54.) Vocational Expert Ann Tremblay (the "VE") also appeared and testified. On February 21, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 8–23.) On April 17, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–5.) Plaintiff then timely commenced the instant action.

## II.[1]

### A. Plaintiff's Testimony

Plaintiff testified that he lives alone on a government housing plan. (R. at 37-38.) He testified that he cannot work due to his seizure condition. He explained that his "mind is very confused after [seizures] and [he] get[s] a lot of memory loss, and the medications that [he] take[s] are heavy and also create problems for [him]." (R. at 39.) Plaintiff testified that he was diagnosed with seizures approximately twenty-five years ago. (*Id.*) He stated that he had trouble maintaining employment because he would be working, and then he would have a seizure and

---

[1] The Undersigned only discusses the evidence in the record related to Plaintiff's seizure condition.

lose his job. (R. at 40.) Plaintiff testified that he has between eight and sixteen seizures per month, despite taking his medication. (*Id.*)

Plaintiff estimated that he is only able to lift about a half-gallon of milk. (R. at 45.) He also stated that he is only able to walk a few blocks at a time. (*Id.*) During the day, he takes naps because his medications cause his head to throb. (*Id.*) Plaintiff acknowledged that he has problems with both his short term and long term memory. (R. at 46.) Plaintiff also testified that he does not really like being around people. (R. at 47.)

Regarding his daily activities, Plaintiff testified that he cooks "simple stuff" like sandwiches. (R. at 48.) He testified that he receives assistance with his laundry and that he sometimes washes his clothes while he is taking a shower because he cannot afford to do it. (*Id.*)

**B.  Medical Records**

On July 14, 2009, Dr. Patel examined Plaintiff for the purpose of determining whether he was disabled. (R. at 301-07.) Plaintiff reported a history of a seizure disorder. He explained that he began having seizures as a result of traumatic brain injury from getting hit by a Mack truck 20 years prior. He reported that he gets tonic/clonic seizures that are breakthrough in nature every two to three months. Dr. Patel also reported that Plaintiff has asthma and bilateral knee pain. Dr. Patel assessed Plaintiff with a seizure disorder status post traumatic brain injury, moderate persistent asthma, knee pain, and depression. (*Id.*) Dr. Patel opined that Plaintiff would be capable of engaging in sedentary type employment if he could better control his knee pain and asthma, and if he continues to get counseling for his depression. (R. at 303.)

In 2009, Perry Mostov, M.D., noted that Plaintiff reported a history of seizure disorder. (R. at 1022.) He described his seizures to have aura and involuntary convulsions. He reported having seizures three to four times each week. *Id.* Dr. Mostov noted that Plaintiff was treated with Dilantin, but had been noncompliant for years. *Id.*

In March 2011, a neurologist, Bassel F. Shneker, M.D., began to treat Plaintiff to evaluate and manage his seizures. (R. at 864-67.) Dr. Shneker noted that Plaintiff seems to have two types of seizures. He explained as follows:

> The first type is events of shaking and LOC [loss of consciousness] without any significant tongue laceration or urinary incontinence. Sometime[s] he has an aura of flashing lights. The episode can last for few minutes. He is confused afterwards. No postictal paralysis. He can have few per week.
>
> His other events are staring events with tremor of the body. He cannot respond during them. He did not endorse automatism. He cannot give us the exact frequency.

(R. at 864.)

Dr. Shneker also noted that Plaintiff suffers from ongoing problems with dizziness, ringing in the ears, shortness of breath, lightheadedness, diffuse pain in the back and joints, difficulty swallowing, and weight gain. (R. at 865.) He diagnosed Plaintiff with "intractable epilepsy, most likely post traumatic epilepsy." (R. at 866.) He explained that Plaintiff seems to have both complex partial and tonic-clonic seizures. *Id.* Dr. Shneker started Plaintiff on Keppra XR and indicated that he may consider stopping Plaintiff's use of Dilantin. *Id.* He also requested an EEG.

On July 8, 2011, Dr. Shneker noted that Plaintiff's EEG showed mild background slowing. (R. at 873.) He further noted that, "Regarding [Plaintiff's] seizures, he continued to

4

have them weekly. The frequency has not changed since he was placed on Keppra. He feels that Keppra made the recovery after the seizure faster." (R. at 873.) Dr. Shneker further noted that Plaintiff tolerates Keppra well without any problems, and that Plaintiff has not had any recent trips to the emergency room due to seizures. *Id.* He assessed Plaintiff with post-traumatic epilepsy and noted that his seizures are not controlled. Finally, Dr. Shnecker increased Plaintiff's Keppra to 1500 milligrams at night and directed him to gradually stop taking Dilantin. (R. at 874.)

In September 2011, Dr. Shneker reported that Plaintiff's seizures were not controlled, despite treatment with anti-epileptic drugs. (R. at 648.) He also stated that Plaintiff continued to average four to eight seizures per month. *Id.*

On October 9, 2011, Plaintiff presented to the emergency room following a reported seizure. (R. at 389.) Plaintiff explained that he was riding a bicycle when the seizure occurred, and he woke up with his bicycle on top of him. He reported that he has anywhere from four to six seizures each week, but sometimes goes several weeks without having a seizure. *Id.* Plaintiff further reported that he takes Keppra as prescribed. *Id.*

On October 23, 2012, Dr. Shneker noted that Plaintiff has epilepsy and chronic hepatitis and needs chronic medical treatment. He further noted that the frequency of Plaintiff's seizures affect his ability to be employed. (R. at 1112.)

In December 2012, Dr. Shneker opined that Plaintiff would only be capable of standing or walking for 4 hours in an 8 hour workday. (R. at 1120.) Dr. Shneker also opined that Plaintiff can never climb ladders or scaffolds or be exposed to unprotected heights, moving mechanical

parts, or operating a motor vehicle. He also opined that Plaintiff should avoid loud noises. (R. at 1123.)

On July 13, 2012, Plaintiff visited Veronique C. Bartman, M.D. for a follow-up visit regarding his hepatitis C. Dr. Bartman's notes provide that "Neuro working to control seizures – has not had observed hospital stay yet." (R. at 1012.) She also noted that Plaintiff's seizures need to be controlled before he could begin treatment of his hepatitis C.

## III.

On February 21, 2013, the ALJ issued her decision. (R. at 8–23.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2008. (R. at 13.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of March 15, 2003. (*Id.*) The ALJ found that Plaintiff had the severe impairments of seizure disorder, migraines, obesity,

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);

hepatitis C, right shoulder disorder, knee disorder, asthma and bipolar disorder.  (*Id.*)  She further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 14.)  At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> [Plaintiff] has the residual functional capacity (RFC) to lift/carry and push/pull up to twenty pounds occasionally and up to ten pounds frequently, stand/walk for six hours within an eight-hour workday, and sit for six hours within an eight-hour workday. He can never climb ladders, ropes, or scaffolds and must avoid fumes, odors, dusts, gases, poor ventilation, unprotected heights, machinery, and driving. [Plaintiff] can occasionally reach overhead with the right upper extremity. He can understand, remember and carry out simple tasks and job instructions. He can sustain attention, concentration, and persistence for minimum two-hour periods. [Plaintiff] is limited to occasional interaction with supervisors, coworkers, and the general public. He can respond appropriately to basic changes in the workplace and is limited to jobs that do not require strict production quotas.

(R. at 16.)

At step four, relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy.  (R. at 22.)  At step five, the ALJ concluded that Plaintiff was not disabled under the Social Security Act.  (*Id.*)

## IV.

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

---

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.

In his Statement of Errors, Plaintiff first asserts that the ALJ failed to formulate an RFC that adequately represents Plaintiff's mental and physical limitations. Plaintiff also asserts that the ALJ erred in finding that his epilepsy does not meet the requirements of Listing 11.03. Finally, Plaintiff asserts that the ALJ improperly failed to mention or consider the opinions of social workers from the mental health clinic Plaintiff attends. For the reasons that follow, the

Undersigned finds that the ALJ's failure to properly consider the evidence at step three with regards to whether Plaintiff met the requirements of Listing 11.03 constitutes reversible error.[3]

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove that all of the elements are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). Nevertheless, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

For her step three determination regarding section 11.00, the ALJ stated as follows:

> . . . [T]he [ALJ] considered the claimant's seizures/epilepsy under section 11.00 (neurological) and SSR 87-6. However, the [Plaintiff's] condition does not meet or equal the requirements of any section within the neurological category or within the Social Security Ruling. Specifically, the medical evidence does not demonstrate seizure activity at listing level frequency after compliance with proper treatment and prescription medication.

---

[3] This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the Undersigned need not, and does not, resolve the alternate bases Plaintiff asserts to support reversal and remand. Nonetheless, the Commissioner is free to consider these contentions should the case ultimately be remanded.

(R. at 14.)  Given the conclusory nature of the ALJ's step three determination, the Undersigned cannot decipher what evidence the ALJ relied upon in concluding that Plaintiff did not meet Listing 11.02 or 11.03.  Accordingly, the Undersigned concludes that the ALJ did not provide adequate reasoning at step three to facilitate meaningful review by this Court.  *See Reynolds v. Comm'r Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) ("In short, the ALJ needed to actually evaluate the evidence, compare it to [] the Listing, and give an explained conclusion, in order to facilitate meaningful review.")  Nonetheless, remand is not necessary on this basis, alone.

"The Sixth Circuit has declined to adopt a blanket rule that remand is required whenever an ALJ 'provides minimal reasoning at step three of the five-step inquiry.'"  *Wischer v. Comm'r of Soc. Sec.*, No. 13-cv-810, 2015 WL 518658, at *12 (S.D. Ohio Feb. 6, 2015) (quoting *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 365 (6th Cir. 2014)).  The Sixth Circuit has found an ALJ's conclusory findings at step three to be harmless error where the plaintiff did not put forth sufficient evidence to demonstrate that his or her impairments met or medically equaled the severity of the listing.  *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014); *see also Forrest,* 591 F. App'x at 365 (citing *Reynolds*, 424 F. App'x at 416 (finding that an ALJ erred by providing no reasons to support his finding that a specific listing was not met, and holding that the error was not harmless because it was possible that the claimant has put forward sufficient evidence to meet the listing)).  Thus, in instances where the ALJ does not properly evaluate a listing, the court must "determine whether the record evidence raises a substantial question as to [Plaintiff's] ability to satisfy each requirement of the listing." *Smith-Johnson,* 579 F. App'x at 432-33.  The claimant "must point to specific evidence that

10

demonstrates he [or she] reasonably could meet or equal every requirement of the listing." *Id.* at 432. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.

Here, because the ALJ has not adequately explained her step three findings, the issue becomes whether Plaintiff has raised a substantial question as to whether his seizure disorder meets or medically equals in severity the requirements of Listing 11.02 or 11.03. The Undersigned concludes that Plaintiff has raised a substantial question as to whether he meets Listing 11.03 and has submitted evidence demonstrating that he could reasonably meet every element of the Listing. Listing 11.03, for nonconvulsive epilepsy, provides as follows:

> Epilepsy - nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. § 404, Appendix 1, § 11.03.

With regard to the first element of Listing 11.03, Plaintiff submitted medical records that contain a "detailed description of a typical seizure pattern including all associated phenomena." 20 C.F.R. § 404, Appendix 1, § 11.03. In 2009, Dr. Mostov noted that Plaintiff's "[p]revious grand mal seizures [are] described with aura, and involuntary convulsions, 3-4/week." (R. at 1022.) In March 2011, Dr. Shneker, Plaintiff's neurologist, noted that he has two types of seizures.

> The first type is events of shaking and LOC [loss of consciousness] without any significant tongue laceration or urinary incontinence. Sometime[s] he has an aura of flashing lights. The episode can last for few minutes. He is confused afterwards. No postictal paralysis. He can have few per week.

11

> His other events are staring events with tremor of the body.  He cannot respond during them.  He did not endorse automatism.  He cannot us the exact frequency.

(R. at 864.)  Dr. Skneker diagnosed Plaintiff with both complex partial and tonic-clonic seizures. (R. at 866.)  During the hearing, Plaintiff himself testified that "his mind is very confused after [seizures] and [he] get[s] a lot of memory loss."  (R. at 39.)   Accordingly, Plaintiff has presented evidence that demonstrates that Plaintiff reasonably could meet the first element of Listing 11.03.

Plaintiff has also presented substantial evidence that his seizures occur more frequently than once weekly in spite of at least three months of prescribed treatment.  The ALJ's sole reason for concluding that Plaintiff did not meet a listing in section 11.00 was the frequency of Plaintiff's seizures.  The ALJ indicated that the "medical evidence does not demonstrate seizure activity at listing level frequency after compliance with proper treatment and prescription medication."  (R. at 14.)   Plaintiff, however, *has* submitted substantial evidence that demonstrates he reasonably could meet the listing.  Not only does Plaintiff testify that he has more than one seizure each week (R. at 40), but his neurologist also notes on several occasions that Plaintiff has four-eight seizures per month.  On July 8, 2011, Dr. Shneker noted that Plaintiff continues to have seizures weekly, despite taking Keppra.  (R. at 873.)  In September 2011, Dr. Shneker noted that Plaintiff averages four to eight seizures per month.  (R. at 648.)  Further, in October 2012, Dr. Shneker opined that the frequency of Plaintiff's seizures affects his ability to be employed.  (R. at 1112.)

Plaintiff also submitted evidence that demonstrates that his seizures continued at the above stated frequency, despite him being compliant with prescribed treatment.  Dr. Shneker

prescribed Plaintiff Keppra XR in March 2011.  (R. at 866.)    In September 2011, six months after he was prescribed Keppra, Dr. Shneker reported that Plaintiff's seizures were not controlled, despite treatment with anti-epilleptic drugs.  (R. at 648.)  Additionally, when in the hospital in October 2011, Plaintiff reported that he takes Keppra as prescribed.  (R. at 389.)  Finally, Dr. Bartman noted that "neuro [was] working to control [Plaintiff's] seizures" and that Plaintiff could not begin his hepatitis C treatment until his seizures were controlled.  (R. at 1022.)  Given the above stated evidence, the Undersigned concludes that Plaintiff has pointed to specific evidence that demonstrates he reasonably could meet the Listing requirement of seizures "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment."  20 C.F.R. § 404, Appendix 1, § 11.03.

      Finally, Plaintiff has provided evidence to demonstrate "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day."  *Id.*  Regarding this final element, Plaintiff has at minimum presented evidence that his seizures could reasonably be found to interfere with activity during the day.  For example, Dr. Shneker opined that the frequency of Plaintiff's seizures would interfere with his ability to be employed.  (R. at 1112.)  Additionally, Plaintiff reported he had a seizure while riding his bike.  (R. at 389.)  Further, Plaintiff testified that he had trouble maintaining employment due to his seizure condition, his mind is confused after he has a seizure, and that his medications are heavy and create problems for him.  (R. at 39.)  The medical record also suggests that Plaintiff is confused after seizures occurr.  (R. at 864.)  This evidence demonstrates that it is possible for Plaintiff to meet the final element of Listing 11.03.

Defendants counter that the ALJ need not exhaustively analyze the evidence at step three. While Defendants are correct that minimal articulation is required at step three, where a plaintiff submits evidence to demonstrate that he could possibly meet every requirement of the Listing, as the Plaintiff did here, such minimal articulation constitutes reversible error. *Smith-Johnson,* 579 F. App'x at 432-33. Given that Plaintiff put forth sufficient evidence to demonstrate that he meets every element of Listing 11.03, the ALJ was required to "actually evaluate the evidence, compare it to [] the Listing, and give an explained conclusion, in order to facilitate meaningful review." *See Reynolds*, 424 F. App'x at 416. While, the ALJ states that the medical evidence does not demonstrate seizure activity at listing-level frequency after compliance with proper treatment and prescription medication, she does not provide any specific evidence to support her conclusion. Thus, because the record evidence raises a substantial question as to whether Plaintiff could meet every element of the Listing 11.03, the Commissioner's decision must be reversed and remanded for re-evaluation of the evidence.

Moreover, a review of the ALJ's decision makes clear that she did not consider all of the evidence related to Plaintiff's seizure disorder in determining the severity of it. Other than her discussion regarding whether Plaintiff's seizure disorder met a listing, the ALJ only discusses this condition one other time:

> The [Plaintiff] is diagnosed with epilepsy/seizure disorder. The [Plaintiff's] EEG showed mild background slowing. The [Plaintiff] was prescribed Dilantin and Keppra. The record reflects the Keppra improved his recovery rate after a seizure. Although the [Plaintiff] testified he experiences eight to sixteen seizures monthly, this frequency is not supported in the record. In October 2011, he presented for emergent care and was assessed with seizures and headaches. Overall, there are few emergency room visits due to seizure activity. The [Plaintiff] also disclosed to Dr. Vasiloff he used to work with his seizure disorder and implied his other medical problems affected his ability to work. Compliance

>  is an issue; in January 2009, the [Plaintiff] admitted that he was without medication for "years."

(R. at 17 (internal citations omitted).)

Given that the above passage is the ALJ's only analysis related to Plaintiff's seizure disorder, it is apparent that the ALJ failed to consider the entire record. For example, the ALJ stated that the record reflects that Keppra improved Plaintiff's recovery rate after a seizure. (R. at 17.) The ALJ did not note, however, that within the same treatment note, Dr. Shneker stated "Regarding [Plaintiff's] seizures, he continued to have them weekly. The frequency has not changed since he was placed on Keppra. He feels that Keppra made the recovery after the seizure faster." (R. at 873.) Thus, while Keppra helped Plaintiff's recovery time, it did not actually reduce the frequency of his seizures. Additionally, the ALJ stated that compliance was an issue and points to treatment records from 2009. She fails to cite to Plaintiff's more recent medical records from 2011 and 2012, which indicate that Plaintiff has been compliant with prescribed medication. Thus, it appears that the ALJ did not consider the entire record when evaluating the severity of Plaintiff's seizure disorder. For this additional reason, remand is appropriate.

## VI.

Accordingly, the Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner for further proceedings.

## VII.

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  July 16, 2015                              /s/ *Elizabeth A. Preston Deavers*
                                                         Elizabeth A. Preston Deavers
                                                         United States Magistrate Judge